**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

VGM FINANCIAL SERVICES,

          Plaintiff,

vs.

VARINDER K. SINGH and VARINDER
K. SINGH, M.D., P.C.,

          Defendants,

_____

VARINDER K. SINGH, M.D., P.C. and
VARINDER K. SINGH,

          Counter Plaintiffs and
          Third-Party Plaintiffs,

vs.

VGM FINANCIAL SERVICES,

          Counter Defendant,

CYNOSURE, INC.

          Third-Party Defendant.

No. 09-CV-2045-LRR


**ORDER**

_____

*TABLE OF CONTENTS*

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

III.  *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . *3*

IV.  *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

V.   *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . *4*

*A. Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
*B. Transaction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
*C. Prior Action* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

**VI.**   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

   *A.*   *Personal Jurisdiction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
      *1.*   *Personal jurisdiction standard* . . . . . . . . . . . . . . . . . . . . *9*
      *2.*   *Personal jurisdiction over Cynosure* . . . . . . . . . . . . . . . . *10*
         *a.*   *Judicial estoppel* . . . . . . . . . . . . . . . . . . . . . . . . . *11*
         *b.*   *Forum selection clauses in Lease and Guaranty* . . . . . *14*
         *c.*   *Cynosure's contacts with Iowa* . . . . . . . . . . . . . . . . *17*
            *i.*   *VGM-financed transactions* . . . . . . . . . . . . . *19*
            *ii.*   *Cynosure's website* . . . . . . . . . . . . . . . . . . . *21*
            *iii.*   *Remaining contacts with Iowa* . . . . . . . . . . . *25*
         *d.*   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*
   *B.*   *Venue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*

**VII.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*

## I.  INTRODUCTION

The matter before the court is the "Motion to Dismiss Amended Third Party Complaint for Lack of Personal Jurisdiction and Improper Venue" ("Motion") (docket no. 25), filed by Third-Party Defendant Cynosure, Inc. ("Cynosure").

## II.  PROCEDURAL BACKGROUND

On August 3, 2009, Plaintiff VGM Financial Services ("VGM") filed a "Petition at Law" ("Complaint") against Varinder K. Singh, M.D., P.C. ("Singh P.C.") and Varinder K. Singh ("Dr. Singh") (together, "Singh") in the Iowa District Court for Black Hawk County, Case No. LACV 109968. On August 19, 2009, Singh removed the action to this court pursuant to 28 U.S.C. § 1441.

On August 21, 2009, Singh filed an Answer (docket no. 7) to the Complaint and asserted counterclaims against VGM. That same date, Singh filed a five-count Third-Party Complaint (docket no. 8) against Cynosure. In the Third-Party Complaint, Singh asserted claims against Cynosure for fraud, negligent misrepresentation, negligence, breach of

warranty and common law indemnity. On September 8, 2009, VGM filed an Answer to Singh's counterclaims (docket no. 12).

On November 10, 2009, Cynosure filed a "Motion to Dismiss Third Party Complaint for Lack of Personal Jurisdiction and Improper Venue" ("First Motion to Dismiss") (docket no. 15). On November 27, 2009, Singh filed a Resistance (docket no. 17) to the First Motion to Dismiss. That same date, Singh filed an Amended Third-Party Complaint (docket no. 16) against Cynosure. On December 4, 2010, Cynosure filed a Reply (docket no. 19) in support of the First Motion to Dismiss.

On February 2, 2010, the undersigned issued an Order (docket no. 24). In the Order, the court noted that the Amended Third-Party Complaint "supercede[d] the Third-Party Complaint and render[ed] it legally ineffective." Order at 2. Because the First Motion to Dismiss sought dismissal of the Third-Party Complaint—not the Amended Third-Party Complaint—the court denied the First Motion to Dismiss as moot with leave to refile.

On February 12, 2010, Cynosure filed the Motion. On March 1, 2010, Singh filed a Resistance (docket no. 27). On March 8, 2010, Cynosure filed a Reply (docket no. 33). On April 8, 2010, Singh filed a Supplemental Resistance ("Supp. Resistance") (docket no. 50). On April 15, 2010, Cynosure filed a Surreply (docket no. 52).

### III. SUBJECT MATTER JURISDICTION

The court has diversity jurisdiction over this case because complete diversity exists among the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States"). The court is satisfied that subject matter jurisdiction exists.

## IV. STANDARD OF REVIEW

The party seeking to establish personal jurisdiction bears the burden to prove it exists. *Romak USA, Inc. v. Rich*, 384 F.3d 979, 983-84 (8th Cir. 2004). At this stage in the proceedings, Singh need not prove personal jurisdiction by a preponderance of the evidence. *Id.* at 983. Rather, Singh need only make a *prima facie* showing of jurisdiction. *Id.* Singh may use affidavits, exhibits or other evidence to meet its burden. *Id.* The court must review the evidence in the light most favorable to the non-moving party. *Id.*

## V. RELEVANT FACTUAL BACKGROUND

### A. Parties

VGM is a division of TCF Equipment Finance, a Minnesota corporation. VGM's principal place of business is in Waterloo, Iowa. Singh P.C. is a Georgia professional corporation with a principal place of business in Duluth, Georgia. Dr. Singh is a medical doctor and resides in Duluth, Georgia. Dr. Singh owns Singh P.C.

Cynosure is a Delaware corporation with its principal place of business in Massachusetts. Cynosure manufactures medical devices, including the Cynosure SmartLipo Laser Body Sculpting Workstation ("Equipment").

### B. Transaction

In early 2008, Mike Denkman, a sales manager for Cynosure, contacted Dr. Singh regarding a possible purchase of the Equipment. According to Denkman, he did so after Dr. Singh expressed interest in the Equipment via Cynosure's website. On March 3, 2008, Denkman and Dr. Singh met in Georgia. At the meeting, Denkman and Dr. Singh executed a "Customer Purchase Agreement" ("First Purchase Agreement") dated February 20, 2008. In the First Purchase Agreement, Singh agreed to purchase the Equipment from Cynosure. However, Singh later had "second thoughts" about the purchase and asked to cancel the order. Affidavit of Mike Denkman ("Denkman Aff.") (docket no. 25-1 at pp. 18-20), at ¶ 5. Cynosure "did not thereafter ship the [Equipment] to Dr. Singh." *Id.*

Dr. Singh "reinitiated contact with [Denkman], again seeking to purchase the same [E]quipment." *Id.* at ¶ 6. According to Denkman, Dr. Singh had "originally expressed an interest in leasing the [E]quipment through a third-party financing company," so Denkman "submitted a request for financing to MedCap Financial, LLC, the company through [which] Cynosure helps its customers to obtain third-party financing if they so choose." *Id.* at ¶ 8. Denkman avers that, "after Cynosure informs MedCap Financial that one of its customers is interested in obtaining third-party financing, MedCap Financial finds a third party that is willing to provide the customer financing." *Id.* at ¶ 10. "The third party then provides proposed terms of the lease to the customer, who can choose to accept the terms, attempt to find another third-party to provide financing, self-finance the transaction or cancel the transaction completely." *Id.*

According to Denkman, MedCap Financial "found" VGM, "who was willing to provide financing to Dr. Singh and [Singh P.C.]." *Id.* at ¶ 11. Denkman states that, "pursuant to typical practice, VGM then sent copies of the proposed Lease and Guaranty both to Dr. Singh and to [Denkman]."[1] *Id.*

On May 20, 2008, Denkman met Dr. Singh at a Starbucks in Georgia to complete the transaction. Cynosure contends that, at the May 20, 2008 meeting, Dr. Singh executed a second "Customer Purchase Agreement" ("Second Purchase Agreement") (docket no. 25-1), at pp. 23-24. The Second Purchase Agreement is two pages long. At the bottom of the second page, it provides:

---

[1] VGM's description of the transaction is largely the same. According to VGM, "[t]he customary practice for transactions involving Cynosure Equipment was for [VGM] to forward the contract documents (including lease agreements and guaranties) to MedCap Financial." VGM Interrogatory Responses (docket no. 50-2), at ¶ 6. VGM "believes that MedCap then forwarded the documents to the Cynosure sales representative assigned to the Customer account." *Id.* "After [Singh] executed the documents, the sales representative would then forward the documents back to MedCap, which would then forward them back to VGM." *Id.*

> This [Second Purchase] Agreement shall be governed by and
> construed under the substantive laws of the Commonwealth of
> Massachusetts. The Customer agrees to submit all disputes
> arising out of, or relating to, this [Second Purchase]
> Agreement to a court in Boston, Massachusetts.

*Id.* at 24. Cynosure argues that Dr. Singh signed the first page of the Second Purchase Agreement and initialed the bottom of the second page. However, Dr. Singh contends that she did not sign or initial the Second Purchase Agreement.

At the May 20, 2008 meeting with Denkman, Dr. Singh executed a "Lease Agreement" ("Lease") with VGM, on behalf of Singh P.C. Complaint Ex. A. Pursuant to the Lease Agreement, Singh P.C. leased the Equipment from VGM. The Lease Agreement contains a provision entitled "GOVERNING LAW; LITIGATION," which provides:

> This [Lease] Agreement shall be interpreted and governed by
> the laws of the State of Iowa. BY SIGNING THIS [LEASE]
> AGREEMENT, CUSTOMER AGREES TO THE
> JURISDICTION AND VENUE OF FEDERAL AND STATE
> COURTS IN IOWA AND CUSTOMER HEREBY WAIVES
> ITS RIGHT TO A JURY TRIAL. [VGM], at its sole
> discretion, may enforce this [Lease] Agreement in any state or
> federal court having lawful jurisdiction thereof.

*Id.* at ¶ 5 (emphasis in original).

At the same time, Dr. Singh executed a "Personal Guaranty" ("Guaranty") with VGM. Complaint Ex. B. In the Guaranty, Dr. Singh agreed that:

> I KNOWINGLY AND VOLUNTARILY AGREE TO THE
> JURISDICTION AND VENUE OF FEDERAL AND STATE
> COURTS IN IOWA.

*Id.* (emphasis in original).

According to Denkman, Dr. Singh could have returned the Lease and Guaranty to VGM herself, but instead asked Denkman to do so. Denkman then "forwarded the Lease and Guaranty to MedCap Financial." Denkman Aff. at ¶ 12. Denkman states that it is

"typical practice for MedCap Financial to then forward the documents to the party providing third-party financing." *Id.* at ¶ 13. Because Cynosure generally retains MedCap Financial to find third-party financing for its customers, Denkman does "not directly contact the party providing financing to a customer." *Id.* at ¶ 14. Denkman "did not contact VGM or its employees while working with Dr. Singh on her purchase." *Id.*

### C. Prior Action

On February 4, 2009, VGM filed a "Petition at Law" against Singh in the Iowa District Court for Black Hawk County, case no. LACV 108119. On March 3, 2009, Singh removed the action to this court pursuant to 28 U.S.C. § 1441, giving rise to *VGM Fin. Serv. v. Singh, et al.*, 09-CV-2017-LRR (N.D. Iowa 2009) (Reade, C.J.) ("Prior Action"). On March 10, 2009, Singh filed an Answer (Prior Action docket no. 8) and asserted counterclaims against VGM for fraud and negligent misrepresentation. That same date, Singh filed a Third-Party Complaint (Prior Action docket no. 9) against Cynosure. In the Third-Party Complaint, Singh alleged causes of action identical to those it asserts against Cynosure in the instant action.

On March 28, 2009, VGM filed an Answer (Prior Action docket no. 13) to Singh's counterclaims. On April 16, 2009, Cynosure filed an Answer (Prior Action docket no. 14) to the Third-Party Complaint. In its Answer, Cynosure admitted that it "is subject to the jurisdiction and venue of this [c]ourt." Third-Party Complaint in Prior Action at ¶ 2; Answer in Prior Action at ¶ 2.

On June 16, 2009, the Clerk of Court filed a "Notice of Dismissal" (Prior Action docket no. 16) in which it notified the parties that the Prior Action would dismissed pursuant to Local Rule 41 "unless appropriate action is taken by or no later than June 30, 2009." Notice of Dismissal at 1. On July 2, 2009, the Clerk entered a "Dismissal Order" (Prior Action docket no. 17) stating that "[a]ppropriate action was not taken in [the Prior Action] within the time provided in the [Notice of Dismissal.]" Dismissal Order at 1.

Accordingly, the Clerk dismissed the Prior Action "with prejudice" based on the parties' failure to submit a proposed scheduling order and discovery plan. *Id.*

On July 7, 2009, VGM filed a "Motion to Modify Dismissal Order" (Prior Action docket no. 18). VGM argued that the Clerk improperly dismissed the Prior Action with prejudice. VGM asked the court to "modify the Dismissal Order so that the [Prior Action] is dismissed *without* prejudice." Motion to Modify Dismissal Order at 2 (emphasis in original). On July 31, 2009, United States Magistrate Judge Jon S. Scoles entered an "Order Amending Judgment of Dismissal" (Prior Action docket no. 21). Judge Scoles concluded that the Clerk of Court "exceeded his authority and violated the terms of Local Rule 41.b when he dismissed [the Prior Action] with prejudice." Order Amending Judgment of Dismissal at 5. Accordingly, Judge Scoles directed the Clerk of Court to amend the Dismissal Order such that the Prior Action was dismissed without prejudice. That same date, the Clerk of Court entered an "Amended Dismissal Order" (Prior Action docket no. 22) dismissing the Prior Action without prejudice.

## VI.  ANALYSIS

Cynosure asks the court to dismiss the Amended Third-Party Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Cynosure also asks the court to dismiss the Amended Third-Party Complaint for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).

### A.  Personal Jurisdiction

Cynosure argues that the court may not exercise personal jurisdiction over it. Cynosure argues that it has insufficient contacts with Iowa to be subject to personal jurisdiction. Singh contends that Cynosure has sufficient contacts with Iowa. Alternatively, Singh argues that Cynosure is bound by the choice-of-law and forum selection clauses in the Lease Agreement and Guaranty between Singh P.C., Dr. Singh and VGM. Finally, Singh argues that Cynosure is judicially estopped from challenging

personal jurisdiction and venue because it did not raise these defenses in the Prior Action.

### 1. *Personal jurisdiction standard*

"A federal court may exercise personal jurisdiction over a nonresident defendant only if doing so is consistent with both the forum state's long-arm statute and the requirements of the Due Process Clause." *Primus Corp. v. Centreformat Ltd.*, 221 F. App'x 492, 493 (8th Cir. 2007) (per curiam) (citing *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004)). Iowa's long-arm statute extends personal jurisdiction over non-residents to the fullest extent permissible under the Due Process Clause. *See* Iowa R. Civ. P. 1.306; *see also Hicklin Eng'g., Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir. 1992) (per curiam) (recognizing same); *Hammond v. Fla. Asset Fin. Corp.*, 695 N.W.2d 1, 5 (2005) (same); *Roquette Am., Inc. v. Gerber*, 651 N.W.2d 896, 899 (Iowa App. 2002) ("Under Iowa Rule of Civil Procedure 1.306, Iowa's jurisdiction reaches to the widest due process parameters of the federal constitution."). Therefore, the court only needs to examine whether the exercise of personal jurisdiction over Defendant comports with due process. *Hicklin*, 959 F.2d at 739.

"The Due Process Clause requires that 'minimum contacts' exist between the nonresident defendant and the forum state before the court can exercise jurisdiction over the defendant." *Miller v. Nippon Carbon Co., Ltd.*, 528 F.3d 1087, 1090 (8th Cir. 2008) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). "'Sufficient contacts exist when the defendant's conduct and the connection with the forum state are such that he should reasonably anticipate being haled into court there, and when maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* at 1090-91 (quoting *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 818 (8th Cir. 1994)).

"The Supreme Court has recognized two theories for evaluating personal jurisdiction: general and specific jurisdiction." *Steinbuch v. Cutler*, 518 F.3d 580, 586

(8th Cir. 2008) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984)); *see also Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004) ("The Supreme Court has set forth two theories for evaluating minimum contacts, general jurisdiction and specific jurisdiction."). General jurisdiction exists "if a defendant has carried on in the forum state a continuous and systematic, even if limited, part of its general business; in such circumstances, the alleged injury need not have any connection with the forum state." *Steinbuch*, 518 F.3d at 586 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984)). However, the plaintiff "must make a prima facie showing . . . that the defendant's contacts were not 'random,' 'fortuitous,' or 'attenuated.'" *Id.* (quoting *Keeton*, 465 U.S. at 774). "Specific jurisdiction on the other hand is appropriate only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities." *Id.* (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

"Both theories of personal jurisdiction require 'some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Dever*, 380 F.3d at 1073 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The Eighth Circuit Court of Appeals has "instructed courts to consider the following factors when resolving a personal jurisdiction inquiry: '(1) the nature and quality of a defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.'" *Id.* at 1073-74 (quoting *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996)).

### 2.     *Personal jurisdiction over Cynosure*

First, the court considers whether Cynosure is judicially estopped from contesting

personal jurisdiction and venue based on its conduct in the Prior Action. Then, the court considers whether Cynosure is subject to personal jurisdiction in Iowa based on the forum selection clauses in the Lease and Guaranty executed by Singh and VGM. Finally, the court considers whether Cynosure has sufficient contacts to be subject to personal jurisdiction in Iowa.

### a.    Judicial estoppel

Singh alleges that Cynosure is "subject to the jurisdiction . . . of this [c]ourt based on Cynosure's Answer filed in [the Prior Action] in this [c]ourt in which Cynosure admitted that it 'is subject to the jurisdiction and venue of this [c]ourt.'" Amended Third-Party Complaint at ¶ 5. Specifically, Singh contends that "the admission by Cynosure in the Prior [Action] judicially estops Cynosure from now claiming that jurisdiction and venue are inappropriate in this [c]ourt." Resistance at 23.

Cynosure argues that the court's dismissal of the Prior Action without prejudice simply "'render[ed] the [Prior Action] a nullity and le[ft] the parties as if the [Prior Action] had never been brought.'" Cynosure Brief at 11 (quoting *Norman v. Arkansas Dept. of Educ.*, 79 F.3d 748, 751 (8th Cir. 1996)). Accordingly, Cynosure contends that judicial estoppel is simply inapplicable in the instant action.

The Eighth Circuit Court of Appeals has long held that "[t]he effect of a voluntary dismissal without prejudice is to render the [dismissed] proceedings a nullity and leave the parties as if the action had never been brought." *In re Piper Aircraft Distrib. Sys. Antitrust Litig.*, 551 F.2d 213, 219 (8th Cir. 1977); *Garfield v. J.C. Nichols Real Estate*, 57 F.3d 662, 666 (8th Cir. 1995) ("Once a dismissal without prejudice is entered and the pending suit is dismissed, it is as if no suit had ever been filed."). "[T]his principle applies with equal force when the court dismisses a case without prejudice on its own initiative." *Norman v. Ark. Dep't. of Educ.*, 79 F.3d 748, 751 (8th Cir. 1996).

Because dismissed proceedings become a nullity, the court's decisions or the

parties' pleadings prior to a voluntary dismissal without prejudice are generally afforded no preclusive effect. *See Piper Aircraft*, 551 F.2d at 219 (holding that district court's class certification decision in prior suit did not resolve the issue in subsequent suit because plaintiff's voluntary dismissal without prejudice of prior suit "carrie[d] down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues, with respect of plaintiff's claim"). Courts have also invoked this principle to allow challenges to personal jurisdiction despite a potentially inconsistent position in a prior, dismissed action. *See Sandstrom v. ChemLawn Corp.*, 904 F.2d 83, 86 (1st Cir. 1990) (holding that the defendant's possible consent to personal jurisdiction in prior action did not bar defendant from contesting the issue in subsequent action because voluntary dismissal of prior action "wipes the slate clean, making any future lawsuit based on the same claim an entirely new lawsuit unrelated to the earlier (dismissed) action").

Although the dismissal of the Prior Action was not a *voluntary* dismissal, it was nonetheless a dismissal without prejudice. The court finds that the dismissal of the Prior Action without prejudice simply rendered the Prior Action a nullity and left the parties "'as if the action had never been brought.'" *Norman*, 79 F.3d at 751 (quoting *Piper Aircraft*, 551 F.2d at 219). Accordingly, Cynosure's admissions in its Answer in the Prior Action do not preclude Cynosure from challenging jurisdiction and venue in the instant action.[2]

---

[2] The court notes that the Eighth Circuit Court of Appeals held that, even where a prior action was dismissed without prejudice, "'an *issue* actually decided in a non-merits dismissal is given preclusive effect in a subsequent action between the same parties[.]'" *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (quoting *Pohlmann v. Bil-Jax, Inc.*, 176 F.3d 1110, 1112 (8th Cir. 1999)) (emphasis in *Pohlmann*). However, the issues of personal jurisdiction and venue as to Cynosure were never "actually decided" in the Prior Action. *Cf. Robinette v. Jones*, 476 F.3d 585, 589-90 (8th Cir. 2007) (applying collateral estoppel to bar a party's claims although prior action was voluntarily dismissed without prejudice because, in the prior action, "the district court had thoroughly analyzed and decided" issues of immunity on "all claims"). The court dismissed the Prior Action due

(continued...)

Even if the Prior Action (and the parties' pleadings therein) was not nullified by the court's dismissal without prejudice, the court finds that Cynosure's jurisdiction and venue challenges are not barred by judicial estoppel. "The doctrine of judicial estoppel 'protects the integrity of the judicial process.'" *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006) (quoting *Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 738 n.6 (8th Cir. 1987)). "A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court." *Id.* "[A] party that takes a certain position in a legal proceeding, 'and succeeds in maintaining that position,' is prohibited from thereafter assuming a contrary position 'simply because his interests have changed,' especially if doing so prejudices the party 'who acquiesced in the position formerly taken by him.'" *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). To determine whether to apply judicial estoppel, a court should consider three non-exhaustive factors:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

---

[2](…continued)

to the parties' failure to submit a proposed scheduling order and discovery plan and never addressed the merits of the Prior Action or issues of jurisdiction and venue.

*Id.* (quoting *New Hampshire*, 532 U.S. at 750-51).

The first factor is met because Cynosure's position in the instant action is clearly inconsistent with its position in the Prior Action that it "is subject to the jurisdiction and venue of this [c]ourt." Prior Action Third-Party Complaint at ¶ 2; Prior Action Answer at ¶ 2. However, the second factor is not met because Cynosure did not "succeed[] in persuading [the] court to accept [its] earlier position[.]" *Stallings*, 447 F.3d at 1047 (quoting *New Hampshire*, 532 U.S. at 750-51). The court dismissed the Prior Action without prejudice based on the parties' failure to submit a proposed scheduling order and discovery plan. At the time of the dismissal, the court had in no way accepted or relied upon Cynosure's admission in the Prior Action that it was subject to personal jurisdiction in this state or that venue was proper in this court. In short, there is no risk that the court's acceptance of Cynosure's position in the instant action will create the perception that the court was "misled." *Id.* Accordingly, there is "no risk of inconsistent court determinations" and "little threat to judicial integrity." *Id.* Therefore, the court declines to apply judicial estoppel to bar Cynosure's jurisdiction and venue challenges in the instant action.

### b. *Forum selection clauses in Lease and Guaranty*

Singh alleges that Cynosure is "subject to the jurisdiction . . . of this [c]ourt via the Iowa forum selection clause in the [Lease] and Guaranty by virtue of its closely related and inextricably intertwined conduct regarding the solicitation and procurement of the signatures of [Singh] on the [Lease] and Guaranty[.]" Amended Third-Party Complaint at ¶ 4. Singh contends that, at the May 20, 2008 meeting, "Denkman was acting on behalf of and in concert with [VGM]." *Id.* at ¶ 16. More specifically, Singh argues that "Denkman solicited [Singh] into signing the [Lease] and Guaranty, and obtained the signed documents after signing and ensured their delivery to VGM." Resistance at 19. According to Singh, "Cynosure's extensive involvement in the transaction under litigation

herein demonstrates that Cynosure is 'inextricably intertwined' with the transaction at issue and accordingly should be bound by the Iowa forum selection clause contained in the [Lease] and Guaranty." *Id.* at 20 (quoting *Vessel Sys., Inc. v. Sambucks, LLC*, No. 05-CV-1028-LRR, 2007 WL 715773, at *9-10 (N.D. Iowa 2007 Mar. 6, 2007) (Reade, C.J.)). Cynosure argues that it should not be bound to the Iowa forum selection clause because the Lease and Guaranty were executed solely by VGM and Singh and Cynosure was not a party to either agreement.

Parties that are non-signatories to an agreement that contains a forum selection clause may nonetheless be bound by the forum selection clause. *See Vessel Sys., Inc.*, 2007 WL 715773, at *9-10 (collecting cases and holding that individual defendants could enforce forum selection clause in agreement executed by their company despite fact that they were not parties to the agreement). "The Eighth Circuit Court of Appeals has held that a 'voluntary plaintiff' who was a shareholder, officer and director of a corporation was so 'closely related' to the disputes arising out of the agreements' that he was 'bound by the forum-selection provisions.'" *Id.* at *9 (quoting *Marano Enters. of Kan. v. Z-Teca Rests., LP*, 254 F.3d 753, 757 (8th Cir. 2001)). Similarly, "when the alleged conduct of non-parties to a contract 'is closely related to the contractual relationship, all participants, parties and non parties should benefit from and be subject to any forum selection clauses contained in the same.'" *Id.* (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) (cited with approval in *Marano*, 254 F.3d at 757)).

In *Marano*, the Eighth Circuit Court of Appeals held that an individual plaintiff, who was a shareholder, officer and director of the plaintiff corporation, was bound by the forum selection clause in the corporation's agreement with the defendant. 254 F.3d at 758. In doing so, the Eighth Circuit Court of Appeals noted that the individual plaintiff "joined with Marano Enterprises . . . in bringing suit against [the defendant] under the agreements, arguably acquiescing in the forum-selection clauses within those agreements."

*Id.* at 757-58. The Eighth Circuit Court of Appeals concluded that, "[a]s a voluntary plaintiff, he will not now be heard to object to jurisdiction limited to venue(s) to which his co-plaintiffs agreed." *Id.* at 758.

*Hugel* involved an agreement between plaintiff Dieter Hugel and defendant Lloyd's. 999 F.2d at 207. The agreement contained a forum selection clause that required the parties to submit their disputes to the courts of England. *Id.* Hugel and two entities, GCM and OMI, subsequently filed suit against Lloyd's in Illinois. *Id.* GCM and OMI argued that only Hugel was bound by the forum selection clause because GCM and OMI were not parties to Hugel's agreement with Lloyd's. *Id.* at 209. The Seventh Circuit Court of Appeals held that, "[i]n order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will become bound." *Id.* (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988)). The Seventh Circuit Court of Appeals found this standard was met for several reasons. First, Hugel was the president and chairman of the board of both GCM and OMI. *Id.* at 209-10. Second, Hugel "own[ed] 99% of the stock of GCM which, in turn, owns 100% of the stock of OMI." *Id.* at 210. Third, "Hugel alone decided that his corporations would participate in Lloyd's investigation[,]" which formed the basis of the action. *Id.* For these reasons, the Seventh Circuit Court of Appeals affirmed the district court's finding that "the corporations owned and controlled by Hugel are so closely related to the dispute that they are equally bound by the forum selection clause[.]" *Id.*

With these principles in mind, the court finds that Cynosure is not bound by the forum selection clause contained in the Lease and Guaranty executed by Singh and VGM. It is undisputed that Cynosure did not sign the Lease or Guaranty. The instant action is markedly different from the facts in *Marano* and *Hugel*, both of which involved parties significantly related, via ownership and/or control, to signatories to the forum selection

clauses at issue. Nothing suggests that Cynosure was so closely related to the dispute such that it would be "foreseeable that it will become bound" to Singh and VGM's forum selection clause. *Hugel*, 999 F.2d at 209.

Singh argues that Cynosure "indisputably had notice" of the forum selection clause in the Lease and Guaranty because Denkman "collected" the documents from Singh "for delivery to [VGM.]" Resistance at 17. However, Denkman averred that he merely "forwarded the Lease and Guaranty to MedCap Financial" at Singh's direction. Denkman Aff. at ¶ 12. Denkman further averred that he "did not contact VGM or its employees while working with Dr. Singh on her purchase." *Id.* at ¶ 14. Singh sets forth no evidence to controvert Denkman's recitation of the transaction. Denkman's mere handling of the Lease and Guaranty at the May 20, 2008 meeting, and subsequent delivery to MedCap Financial (or even VGM), is insufficient to bind Cynosure to the Iowa forum selection clause. In short, the court finds that it was simply unforeseeable to Cynosure that it would be bound by the forum selection clauses contained in the Lease and Guaranty between Singh and VGM.

### c.    *Cynosure's contacts with Iowa*

Singh alleges that Cynosure "has engaged in general and continuous contacts with the State of Iowa, including but not limited to the solicitation and sale of various medical equipment to Iowa medical service providers." Amended Third-Party Complaint at ¶ 3. In other words, Singh contends that the basis for personal jurisdiction over Cynosure is general jurisdiction.[3]

---

[3] Although Singh does not argue otherwise, the court notes that specific jurisdiction does not exist in the instant action. Singh's claims against Cynosure arise out of Cynosure's alleged misrepresentations in Georgia, where Cynosure agents engaged in sales discussions with Singh, (allegedly) obtained Singh's signature and trained Singh on the use of the Equipment. In short, none of Singh's claims against Cynosure relate to contacts of either Singh or Cynosure with Iowa.

Cynosure does not have an office in Iowa. Cynosure does not have a telephone number or bank account in Iowa. It has no employees, representatives or agents in Iowa. Cynosure has engaged in sales or service transactions with Iowa residents. Specifically, Cynosure invoiced Iowa customers for $24,278.75 in 2004, $26,680.40 in 2005, $290,680.40 in 2006 and $430,495.84 in 2007. Some of these sales "involve simple shipments of spare parts to the state at a customer's request and others may involve the repair of Cynosure products in the state." Cynosure's Response to Singh's Request for Production of Documents ("Cynosure RPD Responses") (docket no. 50-5), at ¶ 46.

In 2008, Cynosure made $9,318 in direct sales to Iowa customers. In 2009, Cynosure made $14,927 in direct sales to Iowa customers. Cynosure's direct sales to Iowa customers in 2008 and 2009 represent "the sale of only spare parts sent at the request of Iowa users." Affidavit of Timothy Baker ("Baker Aff.") (docket no. 25-1 at 16-17), at ¶ 3. Cynosure did not make any direct sales of its "laser units" to Iowa users in 2008 or 2009. *Id.*

Cynosure "believes that it has made some shipments to the state of Iowa in connection with" some of its sales to Iowa residents between 2004 and 2009. Cynosure RPD Responses at ¶ 47. "Cynosure employees may have traveled into the state [of Iowa] as part of" its transactions with Iowa residents between 2004 and 2009. Cynosure also "believes that some mail or phone calls would accompany" some of its transactions with Iowa residents from 2004 to 2009. *Id.* at ¶ 48. Cynosure's records reflect that, since March 2008, its employees have made two "service calls" to Iowa to repair equipment. *Id.* at ¶ 46.

Cynosure also lists on its website the contact information of six Iowa medical practitioners that use Cynosure products.[4] The list is available through the "Practitioner

---

[4] Singh repeatedly refers to the listing of Iowa practitioner's on Cynosure's website

(continued…)

Locator" function on Cynosure's website. Exhibit A (docket no. 17-2), at 1-4.

Cynosure has also engaged in financing transactions with VGM, an Iowa resident. Specifically, since January 2007, Cynosure has received payments from VGM in excess of $42 million relating to VGM-financed purchases of Cynosure equipment.

### i. VGM-financed transactions

The parties vigorously dispute the impact of Cynosure's dealings with VGM on the question of general jurisdiction. Cynosure contends that the $42 million of "VGM-financed transactions are irrelevant to personal jurisdiction analysis" because "[VGM] and Cynosure are separate unrelated companies with no agreement for financing of Cynosure customers." Surreply at 2-3. In other words, Cynosure insists that "the customer makes the decision on how to pay and who will finance" and an "independent clearinghouse,[5] which has no contract with Cynosure, provides those options." *Id.* at 3. As such, Cynosure argues that the "raw dollar value of financing funds Cynosure has received from VGM since 2007" has no bearing on whether Cynosure itself has "substantial contact with Iowa." *Id.* at 2.

Singh sets forth no evidence to contradict Cynosure's description of its involvement with its customers' financing arrangements. That is, if a customer requests third-party financing, Cynosure submits a request to MedCap Financial, who in turn locates an entity willing to finance the transaction, who in turn executes a lease with the customer. Although Singh refers several times to Cynosure's transactions with VGM as "sales" to VGM, it is undisputed that the transactions relate exclusively to Cynosure equipment that is used by Cynosure's customers—primarily medical providers in various states—and not

---

[4](…continued)

as Cynosure's "Iowa provider network." *See* Resistance at 11, 14, 15. However, it appears this is a term coined by Singh. Other than in Singh's briefing, the term does not appear in the record.

[5] The court understands this "independent clearinghouse" to be MedCap Financial.

by VGM. In other words, even if Cynosure ultimately receives payment for certain equipment from VGM, these payments relate solely to transactions brokered by Cynosure and its customers.

The court finds that Cynosure's receipt of funds from VGM, an Iowa resident, is not sufficient to support a finding of general jurisdiction. In assessing whether a nonresident defendant should reasonably anticipate being haled into court in the forum state, it is essential that "'there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law.'" *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. at 253). If a defendant's "contacts result from the acts of others, unforeseen and unintended by the defendant, jurisdiction may not be exercised because the contact was not the result of the defendant's purposeful availment." 16 *Moore's Federal Practice*, § 108.42[3][b][i] (3d ed. 2010).

The Supreme Court addressed this issue in *Helicopteros*, where it considered whether a nonresident defendant was subject to general jurisdiction in Texas based, in part, upon its receipt of more than $5 million in payments from the Texas bank account of a Texas joint venture. 466 U.S. at 417. The Court held that the defendant was not subject to personal jurisdiction in Texas. In doing so, the Court found that the defendant's acceptance of checks drawn on the Texas bank account of a Texas entity was of "negligible significance for purposes of determining whether [it] had sufficient contacts in Texas" because there was "no indication that [the defendant] ever requested that the checks be drawn on a Texas bank or that there was any negotiation between [the defendant] and [the third party] with respect to the location or identity of the bank on which the checks would be drawn."

Despite Cynosure's receipt of significant funds from Iowa resident VGM, Singh sets forth no evidence that such receipt is "the result of [Cynosure's] purposeful availment."

16 *Moore's Federal Practice*, § 108.42[3][b][i]. Rather, the record reflects that Cynosure deals primarily, if not exclusively, with their customers—the end-users of its products.[6] Any financing arrangements are handled by the customer and various third parties, including MedCap Financial and entities such as VGM. "Such unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros*, 466 U.S. at 417; *see also Hanson*, 357 U.S. at 253 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state."). The fact that Cynosure may ultimately receive funds related to a sale from an Iowa resident is insufficient to support a finding of general jurisdiction.

### ii. *Cynosure's website*

Singh asserts that Cynosure's website should render it subject to general jurisdiction in Iowa. In *Lakin v. Prudential Sec, Inc.*, the Eighth Circuit Court of Appeals addressed the issue of whether a website may provide sufficient contacts to invoke general jurisdiction. 348 F.3d 704, 710 (8th Cir. 2003). The Eighth Circuit Court of Appeals recognized that many courts have adopted the "sliding scale" approach, established by *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997), to measure website contacts for purposes of *specific* jurisdiction. *Id.* The "sliding scale" approach is based upon the notion that "'the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of the commercial activity that the entity conducts over the Internet.'" *Id.* (quoting *Zippo*, 952

---

[6] For example, Singh sets forth no evidence to controvert Denkman's assertion that he "did not contact VGM or its employees while working with [Singh] on her purchase." Denkman Aff. at ¶ 14. Singh also sets forth no evidence to controvert Cynosure's claim that it directed Singh's request for financing to MedCap Financial, which in turn located VGM.

F. Supp. at 1124).

> At one of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet [website] which is accessible to users in foreign jurisdictions. A passive [website] that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive [websites] where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the [website].

*Id.*

The Eighth Circuit Court of Appeals agreed that "the *Zippo* model is an appropriate approach in cases of specific jurisdiction—i.e., ones in which we need only find 'minimum contacts.'" *Lakin*, 348 F.3d at 711. However, it noted that it was "presented with a case of general personal jurisdiction—i.e., one in which we must find 'substantial and continuous' contacts." *Id.* The Eighth Circuit Court of Appeals found that the "sliding scale" approach alone did not sufficiently account for the requirement that the defendant's contacts be both continuous *and* substantial. *Id.* at 711-12. That is, "[u]nder the *Zippo* test, it is possible for a Web site to be very interactive, but to have no quantity of contacts." *Id.* at 712. This could lead to the "untenable" result in general jurisdiction analysis that the defendant's contacts "would be continuous, but not *substantial*." *Id.* (emphasis in original).

Ultimately, the Eighth Circuit Court of Appeals found that the *Zippo* test was just the starting point in assessing a website's impact on general jurisdiction analysis. In addition to the nature and quality of a website (as captured by the *Zippo* test), the Eighth

Circuit Court of Appeals held that it was also necessary to weigh the *quantity* of the defendant's contacts via its website. *See Id.* ("[W]e will first apply the *Zippo* test and then also look at the quantity of those contacts with [forum state] residents."). Thus, under *Lakin*, "a consideration of the 'nature and quality' of a Web site and a determination of whether is 'interactive,' 'does business,' or is merely 'passive' is an important factor in our analysis." *Id.* at 711. The court must then "look at the quantity of [the defendant's] contacts with [forum state] residents" via its website. *Id.*

Singh argues that "Cynosure has engaged in substantial and ongoing contacts with the State of Iowa . . . [by] maintaining a provider list of Iowa-situated doctors associated with Cynosure on their website for public viewing."[7] Resistance at 4. Singh points out that Cynosure's website reveals six Iowa medical practitioners that use Cynosure products.

The court finds that Cynosure's website falls within the "passive" category of *Zippo*'s "sliding scale." That is, it is "'[a] passive [website] that does little more than make information available to those who are interested in it[.]'" *Lakin*, 348 F.3d at 711 (quoting *Zippo*, 952 F. Supp. at 1124). Singh sets forth no evidence that Iowa residents have ordered products from Cynosure via its website. In fact, nothing in the record suggests that an Iowa resident has ever contacted Cynosure via its website. Rather, Singh relies solely on Cynosure's listing of six Iowa medical providers under the "practitioner

---

[7] Singh argues that Cynosure "built and maintains a Cynosure provider network in Iowa[.]" Resistance at 11. Singh also contends that Cynosure is "actively maintaining its provider network in Iowa[.]" *Id.* The only evidence Singh sets forth in support of these arguments is Cynosure Vice President Timothy Baker's averment that "Cynosure lists certain individuals and entities on the 'Practitioner Locator' section of its website. It does not receive ongoing remuneration for doing so." Baker Aff. at ¶ 4. The court disagrees that this acknowledgment supports the arguments that Cynosure is "actively maintaining" or "build[ing] and servic[ing]" a "provider network" in Iowa. Singh provides no evidence that Cynosure's involvement with the list of Iowa medical providers on its website goes beyond just that—listing them on its website.

locator" function.[8] This weighs against a finding of general jurisdiction.[9] *Id.*

The court also finds that the quantity of Cynosure's contacts with Iowa residents via its website does not support a finding of general jurisdiction. There is no evidence that *any* Iowa residents have visited Cynosure's website, much less contacted Cynosure through its website to order its products or even inquire about them. *Cf. Lakin*, 348 F.3d at 712-13 (noting that general jurisdiction would be improper where record contained no evidence of the number of times Missouri residents had accessed the defendant's website, requested further information regarding its service or utilized its online loan application services but finding that district court abused discretion in denying plaintiff's motion for jurisdictional discovery on these matters). Accordingly, the court finds that Cynosure's listing of Iowa

---

[8] Singh implicitly acknowledges the passive nature of Cynosure's website vis-a-vis Iowa residents. *See* Resistance at 4 (stating that Cynosure maintains a list of "Iowa-situated doctors" "for public viewing"); Supp. Resistance at 6 ("[A] list of Iowa medical professionals that use Cynosure equipment is *available for viewing*.") (emphasis added); *Id.* ("Cynosure admits that at least six different Iowa businesses are *listed on* their website www.cynosure.com") (emphasis added).

[9] Although Singh does not raise the issue, the court notes that Cynosure's website apparently allows customers to contact Cynosure. This much is clear from Denkman's averment that he began sales discussions with Singh after she expressed interest in the Equipment "on Cynosure's web site, at www.cynosure.com." Denkman Aff. at ¶ 2. This does not change the court's conclusion. *See* 16 *Moore's Federal Practice* § 108.44[3] ("As courts have noted, it is now common for businesses of all types to have an internet website, typically with interactive capability through which customers can communicate with the business and order products. If general jurisdiction were to be predicated on these types of contacts alone, most businesses would be subject to personal jurisdiction in every forum."); *Bell v. Imperial Palace Hotel/Casino, Inc.*, 200 F. Supp. 2d 1082, 1092 (E.D. Mo. 2001) (Fleissig, Mag. J.) (cited with approval in *Lakin*, 348 F.3d 704) (holding that, "[e]ven if the existence of an 'interactive' website were sufficient to support general jurisdiction in some circumstances," it could not do so in the absence of any evidence that residents of the forum state had used the website); *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 451-55 (3d Cir. 2003) (stating that the operation of an interactive website was insufficient to support specific jurisdiction without "something more" showing intentional interaction with forum state).

medical practitioners on its website does not support personal jurisdiction over Cynosure.

### iii.    *Remaining contacts with Iowa*

The remainder of Cynosure's contacts with Iowa pertain to its sales to Iowa residents from 2004 to 2009 and related phone calls, mailings or travel into Iowa. In 2004, Cynosure invoiced four Iowa customers for five transactions totaling $24,278.75. Cynosure RPD Responses at Ex. E. In 2005, Cynosure invoiced two Iowa customers for three transactions totaling $26,680.40. *Id.* In 2006, Cynosure invoiced five Iowa customers for five transactions totaling $290,337.40. *Id.* In 2007, Cynosure invoiced five Iowa customers for twelve transactions totaling $430,495.84. *Id.* In 2008, Cynosure invoiced five Iowa customers for nine transactions totaling $9,817.36. *Id.* In 2009, Cynosure invoiced one Iowa customer for one transaction in the amount of $2,020.60. *Id.* As Singh points out, Cynosure admits that its employees "may have traveled to Iowa" as part of these transactions. Supp. Resistance at 5. Cynosure also acknowledges that "some mail or phone calls would accompany" these transactions. Cynosure RPD Responses at ¶ 48. Cynosure further "believes that it has made shipments to the state of Iowa" in connection with these transactions. *Id.* at ¶ 47. Cynosure "has not made marketing or sales efforts targeted specifically at Iowa." *Id.* at ¶ 48. Any mail or phone calls to Iowa residents would have been made in connection with the transactions identified above.

After considering the appropriate factors, the court finds that Cynosure has insufficient contacts with Iowa to be subject to personal jurisdiction in this state. The nature and quality of Cynosure's contacts with Iowa do not support a finding of personal jurisdiction. Singh does not dispute that Cynosure's sales to Iowa residents in 2008 and 2009 "represent the sale of only spare parts sent at the request of Iowa users." Baker Aff. at ¶ 3. Nor does Singh dispute that Cynosure has made "no direct sales of its laser units to Iowa users in either 2008 or 2009." *Id.* While Cynosure acknowledges that it "may have" traveled to Iowa in connection with its sales to Iowa residents between 2004 and

2009, the only evidence Singh sets forth of Cynosure's actual physical contact with the state of Iowa is Cynosure's admission that, since March 2008, its repair employees traveled to Iowa on *two* occasions for "service calls." Cynosure RPD Responses at ¶ 46. These contacts are insufficient to establish personal jurisdiction over Cynosure. *See Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226 (8th Cir. 1987) (holding that defendant did not have requisite minimum contacts despite agents' three day visit to forum state "to review and inspect documents"). The remainder of Cynosure's contacts consist of phone calls, mail and/or shipments to Iowa residents. However, Singh provides no indication of how many phone calls or shipments Cynosure directed to Iowa. Because Cynosure states that any phone calls, mail or other shipments would have been in connection with the transactions discussed above, it is reasonable to assume that such contacts were relatively insignificant given the number of such transactions. In any event, "[c]ontact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause." *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002); *see also Austad Co.*, 823 F.2d at 226-27 (finding New York defendant not subject to personal jurisdiction in South Dakota despite "numerous phone calls between New York and South Dakota, the use of courier services . . . monthly billings mailed to South Dakota, and checks paid by a South Dakota bank"); *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982) ("The use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the 'minimum contacts' required by due process.").

The quantity of Cynosure's contacts also weighs against the exercise of personal jurisdiction. The record reveals that Cynosure dealt with a total of fifteen Iowa customers in the previous six years. In several of these years, Cynosure engaged in five or fewer transactions with Iowa residents. In 2009, Cynosure conducted just one transaction with

an Iowa resident for just over $2,000. While the dollar amount in certain years is fairly significant (e.g., $430,495.84 in 2007), these figures invariably resulted from two or three large transactions, while the remainder were rather trivial.

Iowa also has little interest in providing a forum for either Singh or Cynosure, as neither are Iowa residents. It would likely be more convenient for Singh to litigate its claims against Cynosure in Iowa because Singh is already defending against VGM's claims in this court. However, any inconvenience to Singh is insufficient to overcome the factors discussed above.

### d.  *Conclusion*

The court finds that Cynosure is not subject to personal jurisdiction in Iowa. Accordingly, the court shall grant the Motion to the extent it seeks Cynosure's dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

### B.  *Venue*

In light of the court's finding that Cynosure is not subject to personal jurisdiction in Iowa, the court need not address Cynosure's argument that venue is improper due to the Massachusetts forum selection clause in the Second Purchase Agreement.

### VII.  CONCLUSION

The Motion (docket no. 25) is **GRANTED**. Third-Party Defendant Cynosure, Inc. is **DISMISSED** from the instant action.

**IT IS SO ORDERED.**

**DATED** this 30th day of April, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA